Regis O’Brien, J.
This is an appeal from a judgment of the City Court of Buffalo finding the defendant, who is general manager and vice-president of the Donner-Hanna Coke Corporation guilty of violating sections 162 and 163 of chapter VII of the Ordinances of the City of Buffalo (anti-smoke and air-pollution ordinances) on the 21st day of August, 1953, during the period between 12:45 p.m. and 1:45 p.m., and fining the defendant $250 therefor.
The notice of appeal specifies many points upon which it is based, among which are the following:
That the court erred (a) in finding that the testimony established beyond a reasonable doubt that there was an emission of smoke in excess of the permitted density for a period of fifteen minutes at the time and place charged by the city; also that said testimony established there was matter in the form of fly ash, fumes and odors emitted from said plant at said time *338 and place in violation of said ordinance; (b) in ruling that the operation of the said coke plant is not within the exception permitted by subdivision (a) of section 162 of chapter VTI of the ordinance; (c) in refusing to find that the evidence established that it is impossible for the defendant to adopt other practical measures to eliminate the conditions of which the city complained; (d) in refusing to find that defendant’s plant being situate in an industrial district.in which the operation of a coke plant is permitted, is excused, in view of the evidence, from compliance with the said ordinances, (e) in ruling that the evidence justified a finding that there is another reasonable manner or method by which the said plant may be operated which will produce substantially less dust, fly ash, smoke and odor than was produced at the time of the alleged violation of said ordinance; (f) in holding that the evidence sustained the finding implicit in the decision that the plant involved herein is not a modern and up-to-date plant maintained and operated in the best approved manner and employing all the latest and best means and devices for the reduction and elimination of smoke, fly ash, dust and odors; (g) in refusing to grant the defendant’s motion at the close of the case to dismiss the charges on the many grounds therein specified, and especially in view of the fact that the evidence demonstrated that the coke plant involved is one of the most modern and up-to-date plants in the industry, and in its operation uses and employs all modern means, devices and methods for the reduction and elimination of dust, smoke and odors known or employed in the industry in any coke plant in the United States or Canada.
The burden was upon the city to establish the alleged violation beyond a reasonable doubt. In my opinion, the evidence fails to show compliance with this legal requirement. In fact, a review of the voluminous record, in my opinion, fails to disclose sufficient convincing evidence upon which to sustain the conviction and fine as determined herein.
It appears from the evidence that the defendant is vice-president and general manager of Donner-Hanna Coke Corporation. He has been connected with the coke plant continuously since its construction in 1919, except for a short absence in 1925 when he was general superintendent of another concern in Chicago.
The plant was built by the United States Ordnance Department and completed in 1920. It has been operating continuously ever since. It was purchased from the Government by the corporation.
*339 It was built by the Government for the purpose of providing chemicals necessary for the manufacture of munitions. A large part of these chemicals produced by the plant is still being delivered to the United States Government for that purpose. These products include toluol, benzol, ammonia, ammonium sulphate, zylol and benzol resin, which are used in the manufacture of high explosives.
The plant, built on a parcel of about fifty-four acres of former swamp land, is what is known as a by-product coke plant. It processes coal, its essential raw material, by cooking it in chambers, called “ ovens ”. The cooking releases from the coal the gas and other volatile substances, which are carried off and processed into various chemicals. This leaves in the ovens the carbon residue of the coal in the form of coke.
Production of coke is the primary object of the plant. It goes to Republic Steel Corporation and Hanna Furnace Corporation, both of which are dependent on the coke produced by this plant for their operation. These two industries, together with the coke plant, have a combined payroll reputed to be one of the largest in Buffalo.
The corporation, according to the evidence, processes 1,600,000 to 1,700,000 tons of coal a year. It is necessary in its operation to keep on hand a minimum of thirty days’ supply, which must be stored on the premises. The coal used is the high volatile type and is shipped to Buffalo by rail. Many of the products of the plant are shipped outside the State of New York, and the aggregate value of all products runs close to $29,000,000 a year.
The Donner-Hanna plant is similar to other by-product coke plants and consists essentially of a series of ovens into which the coal must be introduced or “ charged ” for cooking. The cooking process occupies a period of about fifteen hours, during which the volatile substances are eliminated or driven off. This leaves the coke residue from which the coke must be removed by a process called “pushing”. The coke, when finished, is in a state of incandescence. It is pushed out of the ovens into cars on which it is moved to a part of the plant for the quenching operation. This consists of drenching it with water for the purpose of extinguishing the fire and thus saving the coke from burning completely. These are all essential parts of the process of making coke and no one step can be eliminated or materially changed. The constituents of the coal of a gaseous or volatile nature are drawn off in pipes into what is called the “ by-product plant ” where they are processed into various end use products.
According to the evidence, the entire process of making coke, *340 except the handling of the coal and the quenching and handling of the coke after it is produced as above described, is done in apparatus which is closed or sealed off from the air. Thus, three of the essential steps in the process are not so sealed, viz., when the coal is charged into the ovens; when the cooking is completed and the residue removed from the ovens; and finally, when the burning coke is carried to the quencher for dousing with water. Thus, it is obvious that in the operation of all coke plants, there will be necessarily a discharge of some smoke, odor, fumes and ash when the coke is introduced into the oven, and when the coke is removed therefrom.
The evidence reveals that Donner-Hanna has 252 ovens constructed in 6 batteries, numbering from 15 to 51 ovens.
When an oven is charged with coal, the doors are sealed around the edges with a thick moist clay mixture, to make them airtight and prevent the escape of gases. After the cooking process is complete, the lids on top of the oven are opened about fifteen to twenty minutes so that the little remaining gas will catch fire and burn off. The doors are then taken off each end of the oven and the coke is pushed into a car which takes it to the quencher and processed, as previously described. After the coke is quenched it is carried back to one of the coke wharves where it is further cooled and then run off on belts to be loaded on cars.
It appears from the evidence that the method of storing its coal supply and the precautions taken by the Donner-Hanna plant to eliminate or prevent dust from the coal pile are exceptional in the industry and greatly beyond what is done in most plants.
Also that all its coal and coke piles, ovens, cars, quenchers, buildings, structures, equipment and materials, and methods of care and operation are modern, up-to-date, and fully in accord with the best coke plants in the coke industry throughout the United States.
The testimony justifies a finding that there is no known method, device or apparatus known to the industry or employed in any other plant in the United States to eliminate or reduce smoke, dust and fumes, or to alleviate this condition, which is not employed and in use at the Donner-Hanna plant, and that its operation methods and procedures are in accord with the best operational methods employed by the best plants in the industry.
Significantly, according to the evidence, the operation of the plant on August 21, 1953, was normal. There was nothing *341 unusual about it. It also appears, however, that at the time of the alleged violation, the dumps on Tifft Street were burning and emitting volumes of smoke, dust and fumes into the air which could easily have been the cause or source of the complaints of persons living or working in that vicinity.
In my opinion, the testimony offered by the city was not sufficiently convincing to establish beyond reasonable doubt the alleged violation of said ordinance by said defendant. (People v. Susselman Tanning Corp., 114 N. Y. S. 2d 749.)
In view of the testimony, it was and is against the weight of the evidence, to hold that the defendant’s plant, which concededly is in a permitted zone, did not use all the best known and practical means to eliminate and reduce smoke, dust, odor, and fly ash in its operations. Not only does the evidence justify a finding to the contrary, but it also reveals many acts of cooperation on the part of the defendant to help eliminate conditions of which complaint was made in the past. It also appears that the city was invited to have its expert witness visit the plant to make observations and then offer suggestions which the defendant offered to adopt to ameliorate conditions.
The case under consideration resembles the situation discussed by the Court of Appeals in People v. Cunard White Star (280 N. Y. 413) where at page 420 of their opinion, Judge Lehman states, “ the People argue that the conviction must be sustained because ‘ It is no defense to a violation of a public health law that a particular steamship has been so constructed and is so operated as to make continued violations a “ necessary incident ” to the defendant’s carrying on his business.’ That might be true if construction or operation is improper or if change there were practical. Here, however, there is no suggestion that either operation or construction is not in conformity with the highest standards or that occasional emission of smoke, for a few minutes on the day a vessel enters or leaves port, could be avoided by change which would not unreasonably obstruct the operation of the steamship.”
A similar situation was under discussion in the case of People v. New York Central & Hudson Riv. R. R. Co. (159 App. Div. 329, 332) where a conviction of violating the Sanitary Code of New York City which prohibited “ dense smoke to be discharged * * * within * * * said city” was reversed.
The defendant railroad was convicted for allowing smoke to be discharged from locomotives while starting fires therein while said locomotives were in their roundhouse located within the city. The court, in reversing the lower court’s conviction, *342 pointed out at page 333, “ The testimony for the prosecution was confined to showing that smoke came from this roundhouse and these locomotive engines. There was no evidence to show that there was an excess of smohe over that necessary for the operation of the locomotive engines, and no evidence to show that by any other method than that adopted by the defendant could a fire be started in a locomotive engine which would produce less smohe than that produced by the locomotive engines of the defendant.” (Emphasis supplied.)
Again in the more recent case of People v. Oswald (1 Misc 2d 726) the court reiterated the principle of law applicable to our case in the following language (p. 728): “ The resultant smoke which the inspector observed was emitted in spite of all of the precautions, safeguards and equipment. If the defendant did everything that could reasonably be done to prevent the emission of dense smoke and the emission of such smoke was unavoidable, should there be a conviction? ”
The court disposed of its own question by finding the defendant not guilty and pointed out that “ This legislation is regulatory in character and must be interpreted in the light of its necessity and the purpose to be accomplished. It is malum prohibitum and regardless of the efforts made by any individual to avoid a violation of the law or regardless of the intent, if the prohibited acts occur that in and of itself is sufficient to constitute a violation. But this rule is subject to reason and the Court must not close its eyes to obvious facts. The law does not seek to compel a man to do that which he cannot possibly perform. (Walden v. City of Jamestown, 178 N. Y. 213, 217.) ”
In view of my findings as heretofore discussed, it is unnecessary to determine the other specific questions raised by the appeal.
Judgment of conviction should be reversed, and the complaint dismissed.